

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Luis R. Santini Gaudier<br><br>    Recurrido<br><br>                v.<br><br>Comisión Estatal de Elecciones de Puerto Rico, por conducto de su Presidente, Lcdo. Héctor Conty Pérez y sus componentes<br><br>    Peticionaria | 2012 TSPR 82<br><br>185 DPR \_\_\_\_ |

Número del Caso: CT-2012-3

Fecha: 27 de abril 2012

Abogados de la Parte Peticionaria:

        Lcdo. José L. Nieto Mingo
        Lcdo. Hamed G. Santaella Carlo

Abogados de la Parte Recurrida:
Partido Popular Democrático

        Lcdo. Alberto Roig Bigas
        Lcdo. Fernando L. Torres Ramírez

Materia: Certificación

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Lcdo. Luis R. Santini Gaudier

    Recurrido

      v.

Comisión Estatal de Elecciones       CT-2012-003
de Puerto Rico, por conducto
de su Presidente, Lcdo. Héctor
Conty Pérez y sus componentes

    Peticionaria

SENTENCIA

San Juan, Puerto Rico, a 27 de abril de 2012.

Nos corresponde determinar si el Tribunal de Primera Instancia actuó conforme a derecho al emitir la sentencia del 15 de marzo de 2012, archivada en autos el día 16 de ese mes. En ésta concluyó que la Comisión Estatal de Elecciones de Puerto Rico (C.E.E.) incumplió con el Art. 3.015 de la Ley 78-2011 mejor conocida como el Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral). Como consecuencia, el foro primario emitió un injunction preliminar y permanente en el que ordenó a la C.E.E. cesar y desistir de implementar el proceso de escrutinio electrónico -encomendado por la Asamblea Legislativa- para los

procesos eleccionarios a celebrarse el 6 de noviembre de 2012.

## I

El 25 de enero de 2012 el Lcdo. Luis Ricardo Santini Gaudier (Santini Gaudier) presentó un recurso de entredicho preliminar y permanente contra la C.E.E. Posteriormente, presentó una demanda enmendada contra la C.E.E. y los Comisionados Electorales de cada uno de los partidos políticos. En compendio, señaló que la C.E.E. incumplió con los requisitos dispuestos en el Código Electoral para implementar un sistema de escrutinio electrónico. Específicamente alegó que la C.E.E. no publicó la resolución CEE-RS-11-174 en todas las juntas de inscripción permanente, en las alcaldías y las colecturías ni notificó a los partidos políticos, candidatos independientes u otras organizaciones participantes del proceso.[1] Además, indicó que tampoco publicó la CEE-RS-11-174 en dos periódicos de circulación general por lo menos dos veces dentro del término de treinta días desde su aprobación. A su vez, sostuvo que la C.E.E. infringió su deber de notificar a la ciudadanía según impuesto en el Art. 3.015 del Código Electoral al no suministrar toda la información relacionada al escrutinio electrónico en el término de doce meses antes de la celebración de las elecciones generales.

---

[1] El 4 de noviembre de 2011 la Comisión Estatal de Elecciones (C.E.E.) emitió la CEE-RS-11-174: Resolución de Aviso de Sistema de Votación, Sistema de Escrutinio

A base de sus alegaciones, el licenciado Santini Gaudier adujo que el incumplimiento con los requisitos de notificación creó un ambiente de incertidumbre, desasosiego y desinformación sobre el proceso de escrutinio electrónico que le afecta como candidato a las primarias por el Partido Popular Democrático y como elector, por lo cual sufriría un daño irreparable de no concederse el entredicho.[2] Adujo que el daño irreparable consistía en que no podría educar efectivamente en sus comparecencias públicas y privadas sobre las virtudes del sistema y la incertidumbre que ello acarrea. Además, señaló que era previsible que la C.E.E. no podría llevar a cabo una campaña de orientación a la ciudadanía con tiempo suficiente para no ocasionar un verdadero caos en las elecciones generales de 2012. Así las cosas, solicitó al Tribunal de Primera Instancia que emitiera una orden de injunction preliminar para que ese foro determinara si la C.E.E. cumplió con los requisitos estatutarios sobre la notificación requerida.

La C.E.E. se opuso a lo solicitado por el licenciado Santini Gaudier. Sostuvo que el Art. 3.015 del Código Electoral y la Resolución Conjunta Núm. 44 aprobada por

_____

Electrónico conocido como Optical Scanning System (OpScan).

[2] Las primarias fueron celebradas el 18 de marzo de 2012, por lo que resulta innecesario que este Tribunal dilucide los planteamientos relacionados en cuanto a este particular. Al momento en que el Tribunal de Primera Instancia emitiera la sentencia objeto del presente recurso resultaba patente que la C.E.E. no implantaría el escrutinio electrónico para ese evento electoral.

ambos cuerpos legislativos y firmada por el Gobernador el 3 de junio de 2011 le obligaba a implantar un sistema de escrutinio electrónico. Señaló que la notificación de la CEE-RS-11-174 cumplió con lo requerido por el Código Electoral. En ésta se informó sobre los aspectos del escrutinio electrónico conforme surge de los documentos estipulados.[3] Además, la C.E.E. cuestionó la facultad del Tribunal de Primera Instancia para emitir el remedio de injunction permanente solicitado por el licenciado Santini Gaudier en contravención al mandato legislativo y ante la falta de un daño que requiera un remedio extraordinario.

Luego de evaluar las posturas de las partes, el Tribunal de Primera Instancia emitió la sentencia el 15 de marzo de 2012, archivada en autos al día siguiente. Concluyó que la C.E.E. incumplió insubsanablemente con los requisitos de notificación requeridos por el Art. 3.015 del Código Electoral y declaró con lugar la solicitud de injunction preliminar y permanente. Como consecuencia, el foro primario ordenó a la C.E.E. cesar y desistir de implantar el sistema de escrutinio electrónico en los comicios del 2012 como método de escrutinio. Justificó su determinación al concluir que la información provista a los electores era escasa y que la C.E.E. no podría cumplir con lo requerido por el Código Electoral y la Resolución

---

[3]Las partes estipularon la CEE-RS-11-174 y su publicación en español e inglés en los periódicos el Nuevo

Conjunta Núm. 44 sin afectar el derecho al voto de los electores.

Al fundamentar su dictamen, el foro primario determinó que la notificación realizada era insuficiente porque no contenía la compañía contratada, el costo, las máquinas, el programa que se utilizaría, se desconoce cómo se hará el voto o coloca la papeleta, la certeza de la información y qué tipo de sistema se utilizaría. El Tribunal de Primera Instancia sostuvo que el licenciado Santini Gaudier sufre daño como elector al no sentirse seguro sobre el sistema a utilizarse para escrutar los votos y la falta de información que existe sobre éste.[4]

En su análisis, el foro primario examinó el derecho al voto y la notificación realizada por la C.E.E. Razonó que el Art. 3.015 del Código Electoral ordena a la C.E.E. determinar mediante resolución el sistema de escrutinio electrónico que utilizará y establece cómo se debe notificar todo lo relacionado sobre éste a la ciudadanía. Decretó que una vez la C.E.E. emita la resolución que establezca el sistema debe notificarla sin demora a todos los partidos políticos, candidatos independientes y organizaciones participantes por conducto de sus representantes y la exhibirá —en inglés y español— en las

---

Día y el Vocero el 6 y 13 de noviembre de 2011, es decir dentro del término de treinta días desde su aprobación.

[4]Además, indicó que sufre daño irreparable como candidato a Senador por Acumulación debido a que no puede

oficinas de las juntas de inscripción permanente, alcaldías y colecturías. Además, la C.E.E. debe publicarla en no menos de dos periódicos de circulación general por lo menos en dos ocasiones dentro de los treinta días desde su aprobación.

El foro primario concluyó que aunque la Resolución Conjunta Núm. 44 establece un término de por lo menos seis meses antes de la elección para que la C.E.E. reglamente y oriente a la ciudadanía ello no tiene el efecto de enmendar las disposiciones contenidas en el Art. 3.015 del Código Electoral. Por tanto, el Tribunal de Primera Instancia determinó que la C.E.E. estaba obligada a cumplir con una notificación detallada de todo lo relacionado al escrutinio electrónico con por lo menos doce meses antes de la elección. Dictaminó que el contenido de la resolución aprobada y notificada por la C.E.E. no cumple con el mandato legislativo debido a que ésta en esencia recoge lo contenido en la Resolución Conjunta Núm. 44.[5]

Como consecuencia, el foro de instancia ultimó que era necesaria su intervención por encontrarnos ante un agravio de patente intensidad sobre el derecho al voto. Concluyó que aunque las actuaciones de la C.E.E. son bajo la autoridad de una ley procedía conceder el remedio de

_____

adiestrar e instruir a sus funcionarios sobre el sistema de escrutinio electrónico. Véase, nota al calce 2.

[5]El Tribunal de Primera Instancia indicó que tampoco se estableció los procedimientos para la participación de los electores con impedimentos.

injunction permanente. Señaló que era imposible que la C.E.E. lleve a cabo el mandato legislativo a los pocos meses de los eventos electorales y que la falta de exhibir la CEE-RS-11-174 en todas las alcaldías, las juntas de inscripción permanente y las colecturías ocasiona una desinformación a los electores y ciudadanos que puede impedir su ejercicio efectivo del voto en los comicios del 2012. Además, el foro primario indicó que la C.E.E. no ha puesto en vigor mecanismos alternos como una campaña de orientación sobre el proceso, no ha determinado las máquinas, el procedimiento ni los programas que se usarán en ese proceso. Expresó que quedó convencido de que continuar con el proceso del sistema electrónico amenaza nuestro sistema democrático ya que es perturbador que se descanse en un sistema desconocido para el próximo evento electoral.

Inconforme, la C.E.E. acudió ante este Tribunal mediante un recurso de certificación. En éste cuestionó la determinación del Tribunal de Primera Instancia al indicar que erró el foro primario al concluir que la C.E.E. incumplió con el Art. 3.015 del Código Electoral, al interpretarlo y al adoptar alegaciones conclusorias que dieron lugar al interdicto permanente ante un daño hipotético y especulativo. De esta forma, sostuvo que las actuaciones del foro primario impiden la consecución de un fin legislativo legítimo como lo es la implantación del

escrutinio electrónico. La C.E.E. recalcó que cumplió con la notificación requerida y su compromiso de que el sistema de escrutinio electrónico no se implantaría sin corroborarse su funcionamiento y si éste no funciona satisfactoriamente.

Posteriormente, el Comisionado Electoral del Partido Nuevo Progresista (Comisionado del P.N.P.), Lcdo. Iván Cabán Soto, presentó su postura. En ésta resaltó la necesidad de que se haga cumplir la intención legislativa, por lo que la interpretación de un estatuto es lograr que prevalezca su finalidad. Adujo que la interpretación sobre un asunto requiere la integración de las expresiones de la legislatura ya sean contenidas en el estatuto o una resolución conjunta cuyo carácter equivale al de una ley. El Comisionado del P.N.P. expuso que la notificación de la CEE-RS-11-174 cumplió con las disposiciones contenidas en el Art. 3.015 del Código Electoral. Asimismo, indicó que cualquier problema con la notificación a las alcaldías, juntas de inscripción permanente y colecturías puede ser subsanado por la C.E.E.

De otra parte, el Comisionado Electoral del Partido Popular Democrático, el Lcdo. Eder Ortiz Ortiz, presentó su postura. Éste argumentó que el foro primario no adoptó las alegaciones de la demanda presentada por el licenciado Santini Gaudier. Además, indicó que la C.E.E. no cumplió con los requisitos exigidos por la Asamblea Legislativa

para implantar un sistema de escrutinio electrónico. Para ello, arguyó que la C.E.E. incumplió con los requisitos contenidos en el Art. 3.015 del Código Electoral al no asegurarse que la CEE-11-174 fuera publicada sin demora en las alcaldías, colecturías y juntas de inscripción permanente y tampoco notificó todo lo relacionado al escrutinio electrónico en el término de doce meses antes del evento electoral. Así las cosas, sostuvo que la sentencia emitida por el Tribunal de Primera Instancia debe ser confirmada.

Mediante resolución emitida el 13 de abril de 2012 este Tribunal declaró con lugar la certificación solicitada y ordenó al licenciado Santini Gaudier presentar su posición al recurso ante nos. Con el beneficio de la comparecencia de las partes, este Tribunal procede a atender el recurso ante nuestra consideración.

II

A.

En el caso ante nos se cuestiona la orden de interdicto permanente y de cese y desista emitida por el Tribunal de Primera Instancia contra la C.E.E. En aras de atender los planteamientos desde una visión práctica del derecho comenzaremos con discutir la figura del interdicto permanente y luego el Código Electoral para poder determinar si el foro primario actuó correctamente al

concluir que la C.E.E. incumplió con el Código Electoral y al emitir el remedio que hoy nos atañe. Veamos.

No existe controversia en cuanto a que el interdicto o *injunction* constituye un procedimiento especial dirigido a proteger al promovente de daños irreparables a su propiedad o a otros derechos mediante una orden que prohíba u ordene ejecutar determinados actos. Véanse, Asoc. Vec. v. Caparra v. Asoc. Fom. Educ., 173 D.P.R. 304 (2008); Reglas 57.1 a 57.7 de Procedimiento Civil, 32 L.P.R.A. Ap. V, R. 57.1 a 57.7; Artículos 675 a 689 del Código de Enjuiciamiento Civil, 32 L.P.R.A. secs. 3521-3566. Al emitirse el interdicto se constituye un mandato judicial que requiere a una parte que haga o se abstenga de hacer, o que permita hacer, determinada cosa que infrinja o perjudique el de otra. 32 L.P.R.A. sec. 3521.

El interdicto debe concederse con cautela luego de que se demuestre la necesidad para ello y que el tribunal realice un balance de conveniencias y equidades. Los criterios para conceder el interdicto preliminar exigen que sólo se conceda en situaciones claras en que las actuaciones del demandado menoscaben o afecten el derecho que el demandante interesa proteger. Para ello, se considera la naturaleza de los daños, la irreparabilidad o existencia de un remedio adecuado en ley; la probabilidad de que la parte prevalezca en los méritos o que la causa se torne académica y el posible impacto sobre el interés

público. Precisa señalar que al conceder un interdicto permanente también requiere la consideración de la mayor parte de estos criterios. Véanse, Com. Pro Perm. de la Bda. Morales v. Alcalde, 158 D.P.R. 195, 205 (2002); Municipio de Loíza v. Sucns Suárez et al., 154 D.P.R. 333, 366-368 (2001); P.R. Telephone Co. v. Tribunal Superior, 103 D.P.R. 200, 202 (1975); D. Rivé Rivera, El Injunction en Puerto Rico, 53 Rev. Jur. U.P.R. 341, 354 y ss. (1984).

El interdicto permanente se produce por una sentencia final. Los factores que los tribunales deben considerar al momento de emitir un interdicto permanente son: (1) si el demandante ha prevalecido en el juicio en sus méritos; (2) si el demandante posee algún remedio adecuado en ley; (3) el interés público envuelto; y (4) el balance de equidades. Plaza Las Americas v. N & H, 166 D.P.R. 631, 644 (2005); Universidad del Turabo v. L.A.I., 126 D.P.R. 497, 505 (1990).

El Art. 678 del Código de Enjuiciamiento Civil, 32 L.P.R.A. sec. 3524, establece los casos en los cuales está prohibido conceder un injuntion o una orden de entredicho. En lo particular, dispone que no podrá expedirse el remedio extraordinario para impedir la aplicación u observancia de cualquier ley, o el cumplimiento de cualquier actuación autorizada por la Asamblea Legislativa, a menos que mediante sentencia final y firme la ley o la actuación autorizada sea declarada inconstitucional o inválida.

Cualquier injunction emitido sin que se cumplan estas circunstancias es nulo e inefectivo. Ahora bien, el foro primario podrá dictar el interdicto en estos casos si ello es necesario para hacer efectiva su jurisdicción y evitar un daño irreparable, o cuando se alegue que se está privando a la parte peticionaria de algún derecho o privilegio protegido por la constitución o las leyes. En ese momento, el tribunal deberá considerar el interés envuelto y concluir que la parte peticionaria tiene la posibilidad real de prevalecer en los méritos. La orden sólo tendrá vigor en el caso específico y entre las partes. 32 L.P.R.A. sec. 3524(3).

El citado Art. 678 del Código de Enjuiciamiento Civil, es conocido como la Ley Anti-injunction. Éste respondió al propósito de mantener la uniformidad y organización del proceso de gobierno, impidiendo la diversidad de opiniones sobre la constitucionalidad de las leyes. Exposición de Motivos de la Ley Núm. 1 de 25 de febrero de 1946, Leyes de Puerto Rico 3. El precepto angular de dicho estatuto es la presunción de constitucionalidad de las leyes, hasta tanto sean declaradas nulas por sentencia final, firme, inapelable e irrevisable. Asoc. Maestros de P.R. v. Torres, 136 D.P.R. 742, 748-749 (1994). Así, una parte no podrá acudir a los tribunales para impedir la finalidad legislativa por el mero hecho de alegar un posible daño. Claro está, bajo determinadas circunstancias el tribunal

podrá emitir el interdicto, pero para ello debe hacer un balance entre el interés público y lo reclamado por la parte peticionaria.

B.

Los planteamientos ante nuestra consideración requieren que auscultemos el derecho al voto y las actuaciones de la C.E.E. a la luz del Código Electoral. En nuestra jurisdicción el derecho al voto está expresamente consagrado en nuestra Constitución. Éste constituye una de las más preciadas prerrogativas del pueblo. Mediante el voto el pueblo ejerce su poder soberano y expresa su voluntad. Véanse, Ramírez de Ferrer v. Mari Brás, 144 D.P.R. 141, 173 (1997); P.I.P. v. C.E.E., 120 D.P.R. 580, 615 (1988). En Puerto Rico se reconoce que el derecho al sufragio es uno "universal, igual, directo y secreto." Sec. 2 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

Nuestro sistema de gobierno delegó en la Rama Legislativa la potestad de establecer y reglamentar el proceso electoral. En lo pertinente, la Sec. 4 del Art. VI de nuestra Constitución establece que:

> Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas. Sec. 4 del Art. VI de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1.

En atención a esta delegación de poder, la Asamblea Legislativa aprobó el Código Electoral como una legislación

básica de carácter y aplicación general en todo lo concerniente a los procesos electorales. El nuevo Código Electoral responde a la necesidad de ajustar la ley electoral a la experiencia de vida, clarificar términos, mejorar su redacción y corregir sus interpretaciones para facilitar y ampliar el ejercicio del derecho al voto. A su vez, se garantiza la expresión electoral a través del voto mediante un proceso puro que permite al elector participar y que su voto cuente de la forma en que fue emitido. Véanse, Exposición de Motivos del Código Electoral; Art. 2.001 del Código Electoral. De esta forma, nuestra Asamblea Legislativa se ha preocupado por cumplir con el mandato constitucional.

Dentro de los asuntos de mayor relevancia que incluyó el nuevo Código Electoral es que se establece e instituye en Puerto Rico un sistema de votación electrónica para agilizar y facilitar al elector el proceso de votación con las mayores garantías de confiabilidad. A los fines de lograr este objetivo, los legisladores facultaron y delegaron en la C.E.E. la planificación, organización, estructuración, dirección y supervisión del organismo electoral y de los procedimientos en cualquier elección a celebrarse. Art. 3.002 del Código Electoral. Entre las funciones, deberes y facultades delegadas a la C.E.E. se encuentra la siguiente:

(o) **iniciar y desarrollar un plan para la implementación de un sistema de votación,**

escrutinio o ambos utilizando medios electrónicos, en el cual el elector mantenga el control de la papeleta e interactúe con el dispositivo electrónico y su votación sea debidamente guardada; la Comisión previo análisis determinará cuál sistema electrónico será implementado;** el mismo deberá comenzar no más tarde de noventa (90) días luego de aprobarse esta Ley, y deberá incluir, pero sin que se considere una limitación, una proyección económica del costo de implantación escalonada o inmediata, de manera que la C.E.E. pueda hacer la solicitud presupuestaria que será ingresada en el fondo creado para ese fin. Énfasis suplido. Art. 3.002(o) del Código Electoral.

Con relación al sistema de votación, el Código Electoral estableció en su Art. 3.015 como sigue:

**La Comisión determinará mediante resolución, la forma del** proceso de votación electrónica **o escrutinio electrónico a ser usado en todos los colegios electorales.** El elector tendrá posesión y control de la o las papeletas por él votadas, ya sean electrónicas o de papel, hasta que mediante su interacción directa con la máquina de votación o escrutinio electrónico sus votos hayan sido debidamente registrados y sus papeletas guardadas en una urna electrónica o convencional. **La Comisión notificará a la ciudadanía con no menos de doce (12) meses de antelación a la fecha de una elección general todo lo relacionado a la votación electrónica o escrutinio electrónico.** La Oficina de Gerencia y Presupuesto identificará los fondos necesarios para el establecimiento del sistema de votación electrónica o escrutinio electrónico, según sea el caso.
Para una elección especial, la determinación del sistema de votación que se usará en los colegios de votación la tomará la Comisión o la Comisión Especial, según sea el caso, con no menos de sesenta (60) días antes de dicha elección. En los casos de referéndum, consulta o plebiscito se actuará conforme lo disponga su ley habilitadora, en caso que nada se disponga, se actuará como si fuera una elección especial.
Toda elección que se celebre al amparo de esta Ley deberá llevarse a cabo en colegio abierto. **Una vez aprobada la resolución estableciendo el sistema de votación o escrutinio utilizando**

**medios electrónicos, la Comisión sin demora notificará dicha determinación a los partidos políticos, candidatos independientes u organizaciones participantes por conducto de sus representantes. Además, exhibirá dicha resolución, en español e inglés, en las oficinas de las juntas de inscripción permanente, así como en todas las alcaldías y colecturías de rentas internas. De igual modo, la Comisión publicará la resolución, en español e inglés, en no menos de dos (2) periódicos de circulación general, por lo menos dos (2) veces durante el período de tiempo comprendido dentro de los treinta (30) días posteriores a la fecha de la aprobación de la misma.**

El sistema de votación o escrutinio electrónico que apruebe la Comisión proveerá para una votación secreta, no concederá o impondrá ventajas o desventajas a partido político o candidato alguno y no producirá condiciones onerosas a ningún elector o grupo de electores. Además, deberá garantizar que el elector pueda votar mediante una marca o indicación dentro del espacio donde aparezca la representación gráfica de la insignia de un partido o el nombre o emblema de un candidato o agrupación de ciudadanos certificada por la Comisión. La Comisión respetará la intención clara y evidente del elector para que su voto sea contado correctamente y a tales fines el método de votación y formato de la papeleta será diseñado de manera que para el elector sea sencillo, obvio y libre de ambigüedad dónde y cómo hacer su marca o indicación de selección por el candidato o partido de su preferencia en los idiomas español e inglés. La Comisión adoptará los instrumentos o métodos tecnológicos necesarios que garanticen el máximo grado de confiabilidad, validez, seguridad e interpretación correcta de la intención clara y evidente del elector.

La Comisión evaluará los sistemas de votación y de escrutinio basados en los desarrollos tecnológicos y electrónicos más avanzados disponibles para su adopción en Puerto Rico y presentará sus recomendaciones al respecto ante la Secretaría de cada cámara legislativa no más tarde del año siguiente a cada elección. Todo sistema de votación o de escrutinio que se ensaye o implante deberá hacer evidente al elector que se registra su voto y que se adoptan

las medidas para realizar un recuento manual en caso de ser necesario. Énfasis suplido.

Al examinar los requisitos impuestos por el Art. 3.015 del Código Electoral destaca que el legislador requirió a la C.E.E. determinar mediante resolución la forma del proceso del escrutinio electrónico. Además, le impuso el deber de notificar a la ciudadanía lo relacionado a ese proceso con no menos de doce meses antes de las elecciones generales. La resolución emitida por la C.E.E. debía publicarse en inglés y español por lo menos en dos periódicos de circulación general en dos ocasiones dentro del periodo de treinta días desde que fuera aprobada. La resolución debía exhibirse en las alcaldías, colecturías de rentas internas y juntas de inscripción permanente. Para ello, el Art. 3.015 del Código Electoral no estableció un determinado término. Asimismo, la C.E.E. debía notificar sin demora a los partidos políticos, candidatos independientes u organizaciones participantes.

Posteriormente, y con el propósito de autorizar a la C.E.E. a desarrollar e implantar en los procesos electorales del 2012 el uso de un sistema de escrutinio electrónico ambos cuerpos de la Asamblea Legislativa aprobaron el 3 de junio de 2011 la Resolución Conjunta Núm. 44 que contó con el aval del Gobernador. En ésta se expuso que desde el 2000 la C.E.E. ha usado de manera limitada y positivamente en determinados colegios electorales el sistema de escrutinio electrónico para primarias estatales

de los partidos políticos, primarias presidenciales del Partido Republicano y elecciones especiales en distritos o municipios. De la Resolución Conjunta Núm. 44 surge que los métodos empleados han permitido un procesamiento seguro y rápido de los resultados electorales salvaguardando la naturaleza del voto secreto. Al autorizar a la C.E.E. para establecer el mecanismo de escrutinio electrónico la Asamblea Legislativa ordenó la adopción e implantación de éste para los eventos electorales del 2012. Al hacerlo la Resolución Conjunta Núm. 44 estableció, en lo pertinente, como sigue:

> Sección 2.-**La Comisión aprobará,** según la Ley Electoral vigente, **los reglamentos aplicables y los procedimientos a establecer** y hará uso del equipo adecuado y el apoyo técnico indispensable para garantizar que el método de dilución que determine la Comisión Estatal de Elecciones tenga una base de electores y escenario de votación que cumplan con el requisito de al menos una máquina de escrutinio electrónico por cada colegio de votación; que cada elector que participe de los procesos descritos en la Sección 1, **emita su voto con privacidad e independencia; que se cuente cada sufragio en la forma y manera en que fue votado; y que se asegure y proteja evidencia verificable de los votos, en caso de recuento. Asimismo, la Comisión Estatal de Elecciones establecerá en la reglamentación pertinente los estatutos y parámetros para llevar a cabo programas de educación masiva y campaña de orientación dirigida a los electores sobre el sistema de escrutinio electrónico en fecha que no será menos de seis (6) meses antes del evento electoral.** Énfasis suplido.

La Resolución Conjunta Núm. 44 refleja que el legislador contempló el tiempo necesario para informar y educar masivamente a los electores en un término de seis

meses antes del evento electoral. Como se sabe, nuestra constitución establece que "se determinarán por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley." Sec. 18 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1. La Ley sobre Aprobación, Promulgación y Distribución de Leyes y Otros Documentos Ley Núm. 2 de 4 de marzo de 1953, 2 L.P.R.A. sec. 181 *et seq.* (Ley Núm. 2), reglamenta lo relativo a la aprobación de las leyes y resoluciones conjuntas. En cuanto a éstas últimas, dispone que:

> Toda legislación que haya de perder su fuerza al realizarse la obra, o cumplirse la finalidad que persigue será, objeto de consideración por la Asamblea Legislativa mediante resolución conjunta y no formará parte de los estatutos permanentes de Puerto Rico. Estas resoluciones seguirán el mismo trámite que los proyectos de ley. Se Excluyen aquellos casos en que la materia que deba considerarse como resolución conjunta sea parte necesaria, aunque incidental, de una materia principal que deba considerarse mediante proyecto de ley. 2 L.P.R.A. sec. 200.

Así expuesto, las resoluciones conjuntas tienen una duración limitada que deben cumplir con los mismos trámites de un proyecto de ley, por lo que éstas tienen el carácter de las leyes. Véanse, C.R.I.M. v. Méndez Torres, 174 D.P.R. 216, 229 (2008); Noriega v. Hernández Colón, 135 D.P.R. 406, 450 (1994); Op. Sec. Just. Núm. 11 de 1973. De tal relevancia es lo dispuesto mediante resoluciones conjuntas que la Ley Núm. 2, *supra*, provee para que ninguna medida

sea declarada inválida por haberse aprobado mediante este mecanismo en vez de una ley o a la inversa. 2 L.P.R.A. sec. 201.

Lo anterior refleja que tanto la ley como las resoluciones conjuntas contienen la misma fuerza debido a que recogen el mandato o propósito específico legislativo por el cual se crearon. Solamente la Asamblea Legislativa puede variar o derogar lo dispuesto mediante éstas. Es el deber de los tribunales velar para que se cumpla con la disposición legislativa. Para ello, acudimos a una regla de interpretación que es absolutamente invariable y que consiste en hacer cumplir la verdadera intención y deseo del poder legislativo. Al descargar nuestra función debemos siempre considerar cuáles fueron los principios perseguidos por la Asamblea Legislativa al aprobarla, de forma tal que aseguremos el resultado que originalmente se quiso obtener. Una vez se descubre el deseo y la voluntad del legislador el fin de la interpretación ha sido logrado y resulta innecesario aplicar reglas de hermenéutica. Yiyi Motors, Inc. v. E.L.A., 177 D.P.R. 230, 249 (2009); Dorante v. Wrangler of P.R., 145 D.P.R. 408, 417 (1998); Véase, además, R.E. Bernier y J.A. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, San Juan, Publicaciones JTS, 1987, págs. 241-242. Por tanto, los tribunales estamos compelidos a interpretar las leyes, teniendo presente el propósito social que las inspiró,

dándoles un sentido lógico a sus diversas disposiciones y supliendo las deficiencias cuando ello sea inevitable. Cualquier exégesis que resulte absurda al propósito por el cual fue creado el estatuto debe ser rechazada. Sucn. Álvarez v. Srio. de Justicia, 150 D.P.R. 252, 274-275 (2000).

De las antes citadas disposiciones legales se colige que la finalidad legislativa consiste en establecer el sistema de escrutinio electrónico para el evento electoral del 2012 salvaguardando el derecho al voto de los electores. Para ello, la Asamblea Legislativa contempló el tiempo necesario que se requiere para informar sobre la implantación del sistema y lo relacionado a ésta así como para educar a la ciudadanía sobre sus particulares. A esos efectos, mediante la Resolución Conjunta Núm. 44 el legislador estableció que bastaba un término de seis meses antes de las elecciones para instruir a la ciudadanía sobre el procedimiento del escrutinio electrónico. Los tribunales no podemos sustituir el criterio del legislador por el nuestro. Por otra parte, el Art. 3.015 del Código Electoral rige el procedimiento de aprobación y notificación de la resolución mediante la cual la C.E.E. implantaría el proceso de escrutinio electrónico.

No cabe duda de que las actuaciones de la Asamblea Legislativa procuran establecer con primordial importancia un sistema de escrutinio electrónico que no ponga en riesgo

la confiabilidad al proceso ni vulnere el derecho del elector al sufragio universal, al voto secreto y libre de coacción. Al mismo tiempo que se reiteran las garantías de un proceso electoral que refleje una pureza procesal en nuestro sistema democrático.

### III

En resumen, la C.E.E. argumentó que el foro primario recogió como determinaciones las alegaciones no probadas del licenciado Santini Gaudier sin analizar la controversia medular de derecho en el presente caso. Arguyó que el Tribunal de Primera Instancia concedió unos remedios sin que se demostrara la posibilidad de un daño concreto y al asumir que éstos se causarían sin exponer en qué forma las actuaciones de la C.E.E. violan o restringen el derecho al voto. Además, la C.E.E. señaló que erró el foro primario al determinar que incumplió con la notificación requerida por el Art. 3.015 del Código Electoral. La C.E.E. expresamente nos señaló que el hecho de que no haya podido finalizar el proceso de negociación con la compañía seleccionada no significa que proseguirá con su implantación si alberga duda en cuanto a su funcionamiento. Nos remite a la CEE-RS-11-231 de 14 de noviembre de 2011, la CEE-RS-12-01 de 5 de enero de 2012 y la CEE-RS-12-02 de 16 de enero de 2012 para recordar que su compromiso es implantar un escrutinio que no afecte de modo alguno el derecho al voto en el que el

foro primario basa su determinación de conceder el interdicto permanente.[6]

En cuanto a los planteamientos relacionados con las determinaciones del Tribunal de Primera Instancia, éstas gozan de deferencia, por lo que en ausencia de un reclamo específico por la C.E.E. no intervendremos con la apreciación de la prueba realizada por el foro primario. Claro está, dicha deferencia no se extiende a las

_____

[6]La CEE-RS-11-231 de 14 de noviembre de 2011, pág. 13 dispone que:

> En cuanto a la confiabilidad del sistema de escrutinio electrónico que se pretende utilizar en las próximas Elecciones Generales, no debemos olvidar que el mismo se llevará a cabo **únicamente si el mismo pasa todas las pruebas de aceptación de fábrica, en donde se corroborará su funcionamiento por representantes de todos los partidos políticos inscritos**. El Pueblo de Puerto Rico debe tener la confianza de que seremos los primeros en levantar nuestra voz si entendemos que el equipo o la programación no funciona satisfactoriamente, y no daremos paso a la utilización del mismo.

A su vez, la CEE-RS-12-01 de 5 de enero de 2012, pág. 11 establece que:

> Reiteramos, además que si albergáramos cualquier duda en cuanto al funcionamiento del equipo o de la programación del sistema de escrutinio electrónico no daremos paso a la utilización del mismo.

De otra parte, la CEE-RS-12-02 de 16 de enero de 2012, pág. 4 dispone como sigue:

> Según hemos señalado reiteradamente, la selección de esta compañía sólo quiere decir que se comenzará con un proceso de negociación que tiene que ser aceptable para la CEE y para el Pueblo de Puerto Rico. La CEE no permitirá que se suscriba ningún contrato que no proteja celosamente cada centavo de dinero público que se invierta en ese

conclusiones de derecho subsumidas e identificadas erróneamente como determinaciones de hecho. Así nos remitiremos a revisar si la determinación del foro de instancia con relación a que la C.E.E. incumplió con el Art. 3.015 del Código Electoral y la Resolución Conjunta Núm. 44 es correcta en derecho y si procedía que ese foro emitiera el interdicto permanente.

Un análisis desapasionado de la disposición del Tribunal de Primera Instancia refleja que ésta responde a su apreciación de que la C.E.E. no cumplió con el mandato legislativo por entender que no notificó todo lo relacionado al proceso de escrutinio electrónico en el término de doce meses antes de la elección general. Ultimó que la C.E.E. no podía subsanar sus actuaciones. Para justificar su decisión, el foro primario determinó que la Resolución Conjunta Núm. 44 no enmendó el término de doce meses establecido en el Art. 3.015 del Código Electoral. Entendió que el Código Electoral obligaba a la C.E.E. a notificar sobre todos los aspectos del escrutinio electrónico. Estimó que era imposible que la C.E.E. cumpliera el mandato legislativo en los meses que restan antes de las elecciones generales. Igualmente, supuso como un hecho que la C.E.E. implantaría un sistema que atentaría contra el derecho al voto de los electores sin cumplir con

_____

proyecto y la confianza de nuestro Pueblo en su sistema electoral.

su encomienda y sin corroborar su funcionamiento, por lo que entendió necesario emitir el interdicto permanente.

De la discusión previamente reseñada surge indiscutiblemente que la interpretación realizada por el Tribunal de Primera Instancia demuestra que impuso a la C.E.E. requisitos adicionales a los contemplados por el Código Electoral y la Resolución Conjunta Núm. 44. El tribunal de instancia descartó la intención y el deseo legislativo al interpretar y requerir literalmente la publicación de toda la información relacionada con el escrutinio electrónico. Los requisitos impuestos por el foro primario van dirigidos a aspectos técnicos del proceso que en nada afectan el derecho de la ciudadanía con relación a su sufragio. Más aún, el foro de instancia pretendió que la C.E.E. notificara pormenores que a ese momento no habían sido adjudicados por ese organismo. De esta forma, dejó de considerar el propósito social que inspiró la ley y no le impartió un sentido lógico a sus disposiciones. Cuando el foro primario ultimó que la C.E.E. no podría finiquitar su encomienda sin perjudicar el derecho al voto de los electores, en efecto pasó juicio sobre el término dispuesto por la Asamblea Legislativa mediante la Resolución Conjunta Núm. 44 y de *facto* lo sustituyó por el suyo propio para justificar su intervención. Además, obvió las expresiones recogidas en las distintas resoluciones emitidas por la C.E.E. de las

cuales surge un compromiso que demuestra que no se implantará un sistema electrónico de tener cualquier duda o desconfianza en éste y sin pasar las pruebas de aceptación a ser corroboradas por los representantes de todos los partidos políticos.

La lectura de la CEE-RS-11-174 aprobada el 4 de noviembre de 2011 por la C.E.E. para implantar un sistema de escrutinio electrónico cumple con los requisitos impuestos por fíat legislativo. Mediante ésta se informó doce meses antes del evento electoral lo relacionado con el escrutinio electrónico a los electores. La CEE-RS-11-174 notificó que: (1) el voto continuará mediante una marca en una papeleta de papel; (2) los votos se contarán utilizando un lector óptico y las papeletas se depositarán en una urna; (3) el voto se llevará a cabo mediante una interacción directa del elector con la máquina electrónica; (4) el sistema garantizará que el voto sea privado e independiente para que cada voto cuente en la forma en que se realizó; (5) el sistema notificará al elector si emitió un voto válido y ofrecerá la oportunidad para corregir cualquier error que pudiera invalidarlo; (6) las papeletas serán depositadas en una urna adherida a la máquina para protegerlas como evidencia verificable en caso de escrutinio o recuento manual; (7) la C.E.E. promulgará la reglamentación necesaria para llevar a cabo un programa de educación masiva y campaña de orientación dirigida a los

electores sobre el sistema de escrutinio electrónico con por lo menos seis meses antes de las elecciones generales.

Los hechos determinados y recogidos en la sentencia emitida por el Tribunal de Primera Instancia demuestran que la CEE-RS-11-174 fue aprobada el 4 de noviembre de 2011 y que ésta fue publicada –en inglés y español– en El Nuevo Día y en el Vocero los días 6 y 13 de noviembre de 2011, es decir, durante el término de treinta días dispuesto en el Art. 3.015. Asimismo, surge que ésta fue comunicada sin demora a los partidos políticos, candidatos independientes u otras organizaciones. Además, la C.E.E. remitió, mediante mensajero el 9 de noviembre de 2011, al Secretario de Hacienda la CEE-RS-11-174 para su publicación en las colecturías de rentas internas y que el señor Nelson Alvarado certificó que la envió por facsímil a las juntas de inscripción permanente. Existe evidencia de que 24 de las 104 juntas de inscripción permanente fueron notificadas. El foro primario determinó que no existe evidencia de que se notificó a las alcaldías ni que se indicó a éstos que debían publicar la resolución. No obstante, no determinó que la C.E.E. no hubiera notificado a las alcaldías. De no haberse exhibido o notificado la CEE-RS-11-174 a todas las colecturías, alcaldías o juntas de inscripción permanente no vemos razón alguna para concluir –como lo hizo el foro primario– que ello es insubsanable. Recordamos que el Art. 3.015 del Código

Electoral no fija un término para que las alcaldías, colecturías y juntas de inscripción permanente exhiban la CEE-RS-11-174.

Juzgamos que al emitir la CEE-RS-11-174 la C.E.E. cumplió con los requisitos impuestos por el Código Electoral y la Resolución Conjunta Núm. 44. No podemos avalar la interpretación literal y aislada que realizó el Tribunal de Primera Instancia. La sentencia emitida por el foro primario no responde a la intención legislativa plasmada en ese estatuto ni recogida en la Resolución Conjunta Núm. 44. La sentencia del foro primario presume –sin prueba o base alguna- que la C.E.E. aprobará un sistema que no responda al mandato legislativo que produzca o interfiera con el derecho al voto.

Al momento de emitir el dictamen ante nuestra consideración, la C.E.E. desempeñaba lo ordenado por la Asamblea Legislativa para implantar un sistema de escrutinio electrónico para las elecciones del 2012. La C.E.E. no lo había instaurado. Para ello, la C.E.E. está obligada a cumplir con los requisitos establecidos en el Código Electoral, la Resolución Conjunta Núm. 44 y las expresiones recogidas en las resoluciones emitidas por la propia C.E.E.

Una vez determinado que la C.E.E. cumplió con los requisitos establecidos por el Art. 3.015 del Código Electoral y la Resolución Conjunta Núm. 44 resulta

claramente improcedente la expedición del interdicto permanente para impedirle cumplir con la observancia de la ley en cumplimiento de la actuación autorizada por la Asamblea Legislativa. No estamos ante el cuestionamiento de que dicha delegación es inconstitucional o inválida. Tampoco era necesario que el Tribunal de Primera Instancia hiciera efectivo el interdicto para proteger el derecho al voto del licenciado Santini Gaudier o el de cualquier elector. A este momento, no existe posibilidad alguna de que las acciones de la C.E.E. encaminadas a cumplir con las delegaciones de la Asamblea Legislativa conlleven un daño al derecho del sufragio reconocido en nuestro sistema. Tal conclusión es una altamente especulativa y a destiempo. Más aún, la misma constituye una adjudicación sobre lo decretado por la Asamblea Legislativa al aprobar la Resolución Conjunta Núm. 44 estableciendo un término de tan sólo seis meses para orientar e informar a la ciudadanía sobre los procesos electorales relacionados con el escrutinio electrónico. Por tanto, el Tribunal de Primera Instancia erró al emitir el interdicto permanente y la orden de cese y desista en el caso ante nuestra consideración.

IV

Por los fundamentos expuestos, este Tribunal revoca la sentencia emitida por el Tribunal de Primera Instancia.

Notifíquese inmediatamente por teléfono, facsímil y por la vía ordinaria.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres emitió Opinión de Conformidad, a la cual se une la Jueza Asociada señora Pabón Charneco. El Juez Presidente señor Hernández Denton hace constar la siguiente expresión: "Entiendo que la Comisión Estatal de Elecciones no cumplió plenamente con su deber de notificar a la ciudadanía "todo lo relacionado" al escrutinio electrónico con al menos doce (12) meses de antelación a la fecha de la elección general, según establecido por el Art. 3.015 del Código Electoral de Puerto Rico para el Siglo XXI. Como señala la Juez Asociada señora Rodríguez Rodríguez en su Opinión Disidente, reproducir mecánicamente el contenido de varias disposiciones del Código Electoral sobre este tema en una resolución administrativa, sin más, no se adhiere al mandato legislativo de notificar "todo lo relacionado" al escrutinio electrónico en dicho plazo. Por otro lado, no comparto el análisis de una mayoría de este Tribunal en cuanto al efecto modificativo que una Resolución Conjunta pueda tener sobre una ley que forma parte de los estatutos permanentes de nuestro ordenamiento. No obstante lo anterior, soy del criterio que la acción que origina el recurso de autos no cumple con los requisitos esenciales para que proceda un *injunction* que paralice la aplicación u

observancia de una ley que ha sido válidamente aprobada por la Asamblea Legislativa. En particular, entiendo que el incumplimiento de un mandato legislativo por parte de una agencia administrativa llamada a implantarlo no conlleva – en este caso- la suspensión de dicho mandato. Más aun, los daños alegados por el demandante y el incumplimiento de la Comisión son en todo caso subsanables, pues existen otros remedios adecuados en ley para reparar los mismos. Por ejemplo, el propio Código Electoral reconoce un remedio de revisión judicial y existe la posibilidad de presentar una acción de *mandamus* para sujetar la actuación administrativa al mandato legislativo. Por último, cabe recalcar que este caso no versa ni resuelve varios asuntos de interés público, tales como las controversias sobre la adjudicación de la subasta y la contratación para implantar el escrutinio electrónico. Actualmente existen otros recursos presentados ante el Tribunal de Primera Instancia que no están ante la consideración de este Tribunal y atienden esas controversias. Por todo lo anterior, concurro con el resultado de la Sentencia del Tribunal." La Jueza Asociada señora Fiol Matta concurre con el resultado al entender, por las razones expuestas por el Juez Presidente señor Hernández Denton, que el recurso presentado por el licenciado Santini Gaudier no cumple con los requisitos para que se emita un *injunction* que paralice las acciones de la Comisión Estatal de Elecciones en cumplimiento con lo

dispuesto en el Código Electoral. La Juez Asociada señora Rodríguez Rodríguez disiente con opinión escrita.


                              Aida Ileana Oquendo Graulau
                              Secretaria del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | | |
|---|---|---|
| Lcdo. Luis R. Santini Gaudier<br><br>Recurrido<br><br>v.<br><br>Comisión Estatal de Elecciones de Puerto Rico, por conducto de su Presidente, Lcdo. Héctor Conty Pérez y sus componentes<br><br>Peticionario | CT-2012-003 | |

Opinión de conformidad emitida por el Juez Asociado señor MARTÍNEZ TORRES a la cual se une la Jueza Asociada señora PABÓN CHARNECO

En San Juan, Puerto Rico, a 27 de abril de 2012.

Han transcurrido más de dos meses de celebradas las primarias de los partidos políticos y no contamos todavía con candidatos certificados por la Comisión Estatal de Elecciones (CEE). La razón principal: la ausencia de tecnología que brinde agilidad y mayor certeza en el escrutinio de votos el día de la celebración del evento y que contribuya a desalentar cualquier tipo de fraude electoral.

Ante ese escenario, este Tribunal no puede abonar al clima de desconfianza y confirmar una sentencia del Tribunal de Primera Instancia que constituye un veto al mandato legislativo válido de incorporar el escrutinio electrónico de votos a nuestro sistema electoral. Con ese

mecanismo, se fomentará un mayor grado de transparencia y pureza en la tabulación de los votos de las próximas elecciones generales. Ausente un problema constitucional, nuestro deber es respetar el mandato del pueblo, expresado por conducto de sus legisladores electos. Véase, R. Elfren Bernier y J. Cuevas Segarra, Aprobación e Interpretación de las Leyes en Puerto Rico, 2da ed. Rev., San Juan, Publicaciones J.T.S., 1987, pág. 299.

Aristóteles planteaba que "el comienzo es más de la mitad de la totalidad". B. Jowett, The Politics of Aristotle, Ed. Claredon Press, 1885, pág. 195. (Traducción nuestra.) La disidencia, por su parte, se ampara en que como la CEE no difundió "todo lo relacionado al escrutinio electrónico" con doce meses de antelación a las elecciones, perdió la oportunidad de comenzar el proceso ordenado por la Asamblea Legislativa, en un periodo de seis meses previo a las elecciones. Con ello, la disidencia le niega a la CEE mayores herramientas que fortalezcan la transparencia y el derecho del elector a que su voto se cuente efectivamente, incluyendo el del elector que presentó este caso con la alegación de que se afectaría la validez de su voto.

Para adoptar la contención de la disidencia habría que ignorar que el propio ente que exigió y no definió el concepto "todo lo relacionado" -la Asamblea Legislativa- estableció posteriormente, mediante Resolución Conjunta,

unos requisitos específicos al evento de las elecciones generales, para ser cumplidos en un término menor de seis meses. Esa medida es válida como instrumento legislativo para atender la situación única que se da en este año electoral en que se pautó la implementación por primera vez de un escrutinio electrónico de los votos.

Aclarado esto, la construcción de la disidencia se derrumba y lejos de ser un acto enmarcado en nuestra deontología profesional se asemeja más a un acto de odontología, en el cual se pretende imponerle un retenedor a la CEE para fomentar que la partidocracia continúe dominando los procesos de escrutinio, sin mecanismos objetivos de supervisión y fiscalización. Atarle las manos a la CEE para que no pueda realizar las encomiendas conducentes a la implantación del escrutinio electrónico nos convertiría en promotores de la desconfianza en el proceso electoral. Con ello, provocaríamos un estado de incertidumbre del Pueblo hacia la institución que tiene el deber ministerial de implantar los mandatos legislativos en materia electoral.

Por los fundamentos contenidos en la Sentencia emitida por este Tribunal, es mi criterio que la democracia ha ganado en el día de hoy y voto conforme con brindarle a la CEE la oportunidad de cumplir con un mandato legislativo diseñado para fortalecer el derecho al voto de todos los electores. Confío que el Pueblo sabrá distinguir entre el

dictamen de este Foro y cualquier arenga partidista que se lance como parte de una campaña de descrédito y demonización hacia este Tribunal.


RAFAEL L. MARTÍNEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Lcdo. Luis Ricardo Santini Gaudier<br><br>Recurrido<br><br>v.<br><br>Comisión Estatal de Elecciones de Puerto Rico, por conducto de su Presidente, Lcdo. Héctor J. Conty Pérez y sus componentes<br><br>Peticionaria | CT-2012-0003 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 27 de abril de 2012

> "A line will take us hours maybe; Yet if it does not seem a moment's thought, our stitching and unstitching has been naught".
>
> -W. B. Yeats, "Adam's Curse"[7]

Escribir una Sentencia o una Opinión de este Tribunal puede tomar horas o días de mucha investigación y razonamiento, pero si el resultado al que se llega no alberga las exigencias de nuestra deontología profesional

---

[7] "Un solo verso puede exigir muchas horas; pero si no parece el don de un momento, nuestro tejer y nuestro destejer son inútiles", traducción de Jorge Luis Borges, "Miguel de Cervantes: Novelas ejemplares", *en Prólogos con un prólogo de prólogos* (1975).

como garantes de los derechos de la ciudadanía, nuestra función como jueces se torna inútil. La Sentencia que esta Curia emite hoy en el caso de autos representa un acto de descobijar a la ciudadanía de la protección contra actuaciones irrazonables y *ultra vires* de una agencia. Además, representa un intento de restringir la protección de la ciudadanía a su derecho al voto y a estar notificado con relación al proceso electoral que la Asamblea Legislativa estatuyó en el nuevo Código Electoral de Puerto Rico, *infra*. Por entender que una mayoría de este Tribunal yerra en las interpretaciones de las disposiciones legislativas referentes al proceso de escrutinio electrónico en las próximas elecciones generales de 2012, disiento de tal proceder.

**I**

Los hechos de este caso son sencillos, por lo que acogemos las determinaciones de hecho realizadas por el Tribunal de Primera Instancia, **tal cual hace la Sentencia emitida por esta Curia.** *Véase* Sentencia, págs. 21-22. Bien es sabido que en ausencia de pasión, prejuicio, parcialidad o error manifiesto, sostendremos la apreciación de la prueba y las determinaciones que realice el foro sentenciador. *Pueblo v. Maisonave*, 129 D.P.R 49 (1991).

En síntesis, el aquí recurrido, Lcdo. Luis Ricardo Santini Gaudier, presentó una demanda de entredicho

provisional, preliminar y permanente contra la Comisión Estatal de Elecciones (C.E.E.), por conducto de su Presidente, el Lcdo. Héctor J. Conty Pérez, y contra los Comisionados Electorales que forman parte de la C.E.E. Adujo que la C.E.E. incumplió con el mandato expreso del Art. 3.015 del Código Electoral de Puerto Rico para el Siglo XXI (Código Electoral), Ley Núm. 78 de 1 de junio de 2011, según enmendada, al no publicar una resolución concerniente a **todo lo relacionado** al escrutinio electrónico "con no menos de doce (12) meses de antelación a la fecha de una elección general". Código Electoral, Art. 3.015. Además, el recurrido expuso que la C.E.E. también incumplió con el requisito de notificación y publicidad de dicha resolución al no exhibirla en todas las juntas de inscripción permanente, alcaldías y colecturías ni notificarla a los partidos, candidatos independientes, organizaciones participantes ni publicarla en dos periódicos de circulación general dentro del término de treinta días posterior a la aprobación de la resolución.[8]

De todos estos reclamos, queremos enfocar nuestra atención al asunto medular de esta controversia. A saber, si con la Resolución CEE-RS-11-174 (Resolución Núm. 174) del 4 de noviembre de 2011 la C.E.E. cumplió o

---

[8] El Tribunal de Primera Instancia acogió como estipulación de hecho número cuatro y cinco que la

no con el requisito de ley de emitir con no menos de doce (12) meses previo a la elección general del 6 de noviembre de 2012 una resolución con **todo lo relacionado** al escrutinio electrónico. De concluir, como demostraremos, que la C.E.E. incumplió con dicho requisito, entonces analizar las otras exigencias de notificación y publicidad resultaría un ejercicio nimio, baladí e inconsecuente. Si el eslabón original resulta defectuoso, los demás eslabones que se desprenden como consecuencia de éste, igual lo son. Examinemos a continuación la controversia planteada.

## II

### A

La Constitución de Puerto Rico consagra que "el sistema democrático es fundamental para la vida de la comunidad puertorriqueña ... [y] entendemos por sistema democrático aquel ... donde **se asegura la libre participación del ciudadano en las decisiones colectivas**". Const. P.R., Preámbulo (énfasis suplido); *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 92 (1980) ("En el Preámbulo de nuestra Constitución se recalca la importancia de la democracia para la vida de la comunidad puertorriqueña y lo fundamental del voto para la existencia de esa democracia"). *Véase además*, *McClintock v. Rivera Schatz*, 171 D.P.R. 584, 597 (2007).

_____
Resolución CEE-RS-11-174 se publicó en dos periódicos de

Como corolario de esa aspiración colectiva a una sociedad democrática, la Sección 2 de la Carta de Derechos de la Constitución establece que "Las leyes garantizarán la expresión de la voluntad del pueblo mediante el sufragio universal, igual, directo y secreto, y protegerán al ciudadano contra toda coacción en el ejercicio de la prerrogativa electoral". Const. P.R. Art. II, Sec. 2. La importancia que reviste esa disposición constitucional la hemos reconocido históricamente en este Tribunal al expresar que el derecho al sufragio es una garantía fundamental que es consustancial con la existencia de una democracia política. *P.N.P. v. De Castro Font*, 172 D.P.R. 883, 946 (2007); *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *Giménez v. Junta Estatal de Elecciones*, 96 D.P.R. 943, 947 (1968).

Esa importancia también se hace eco al reconocer en el derecho al sufragio una manifestación del derecho a la libertad de expresión. *Ramírez de Ferrer v. Mari Brás*, 144 D.P.R. 141, 204 (1997) ("sancionar a una persona por ejercer el derecho de su libertad de conciencia, privándolo del derecho al voto ... apareja una violación al derecho de expresión". J. Fuster Berlingeri, Op. Mayoritaria) ("al establecer el derecho al voto, la Sec. 2 del Art. II de nuestra Constitución lo entrelaza con su

_____
circulación general los días 6 y 13 de noviembre de 2011.

propósito ulterior: garantizar la expresión libre de la voluntad ciudadana". J. Negrón García, Op. Concurrente, 144 D.P.R. en la pág. 223).

El Tribunal Supremo de Estados Unidos también ha reconocido la primacía del derecho al voto y su carácter como un derecho político fundamental bajo la Constitución de ese país. *Véase, e.g., Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184 (1979) ("Voting is of the most fundamental significance under our constitutional structure"); *Reynolds v. Sims*, 377 U.S. 533, 554-555 (1964) ("the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections.... The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government"); *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Ahora bien, ese derecho tan fundamental para nuestro sistema político es dejado en manos de la Asamblea Legislativa para que lo reglamente. La Constitución de Puerto Rico provee al respecto: "Se dispondrá por ley todo lo concerniente al proceso electoral y de inscripción de electores, así como lo relativo a los partidos políticos y candidaturas". Const. P.R. Art. VI, Sec. 4. Por lo tanto, "la facultad de la Asamblea

Legislativa para regular el proceso electoral así como los partidos, tiene una insoslayable dimensión constitucional". *McClintock v. Rivera Schatz*, 171 D.P.R. 584, 598 (2007).

Sin embargo, dicho poder no es absoluto, puesto que se halla limitado por otros derechos de carácter fundamental garantizados por la propia Constitución. *P.R.P. v. E.L.A.*, 115 D.P.R. 631, 636-637 (1984); *P.S.P., P.P.D., P.I.P. v. Romero Barceló*, 110 D.P.R. 248, 256-257 (1980). Por ello es que el sufragio, como expresión individual y colectiva, ocupa un sitial de primerísimo orden que **obliga a los tribunales a conferirle la máxima protección**. *Suárez v. C.E.E. I*, 163 D.P.R. 347, 355 (2004). En el ejercicio de esa protección es que los tribunales venimos llamados a ejercer nuestro poder de revisión contra actuaciones del Estado que interfieran con los procesos democráticos.[9] *Véase Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84, 88 (1980); John Hart Ely, *Democracy and Distrust: A Theory of Judicial Review*, pág. 117 (1980) ("unblocking stoppages in the democratic process is what judicial review ought preeminently to be about").

**B**

---

[9] Teniendo en cuenta la envergadura del derecho al sufragio dentro de nuestro sistema democrático, la protección a este derecho constitucional satisface la excepción a la norma general de la Ley Anti-injunction. Cód. de Enj. Civ., Art. 678, 32 L.P.R.A. Sec. 3524.

El 1 de junio de 2011 la Asamblea Legislativa promulgó el nuevo Código Electoral al amparo del deber constitucional de regular los procesos electorales. Con ello se reafirmó "el principio de que los propósitos de existencia de un ordenamiento electoral descansan en unas **garantías de pureza procesal capaces de contar cada voto en la forma y manera en que sea emitido**". Código Electoral, Art. 2.002 (énfasis suplido). En la Exposición de Motivos del Código Electoral se mencionó que "esta medida busca fortalecer el sistema democrático de la Isla, **ampliar derechos a los electores**, así como reducir al mínimo la intervención de elementos ajenos al proceso electoral con la voluntad del electorado". *Id.* Exposición de Motivos.

En el artículo 3.015 del Código Electoral se preceptuó lo concerniente a la controversia de autos. Allí se estableció:

> La Comisión **determinará mediante resolución**, la forma del proceso de votación electrónica o escrutinio electrónico a ser usado en todos los colegios electorales. El elector tendrá posesión y control de la o las papeletas por él votadas, ya sean electrónicas o de papel, hasta que mediante su interacción directa con la máquina de votación o escrutinio electrónico sus votos hayan sido debidamente registrados y sus papeletas guardadas en una urna electrónica o convencional. La Comisión notificará a la ciudadanía con **no menos de doce (12) meses de antelación** a la fecha de una elección general **todo lo relacionado** a la votación electrónica o escrutinio electrónico.

Además del Art. 3.015, el Código Electoral posee otras disposiciones relacionadas al escrutinio electrónico y que resultan pertinentes a esta controversia: los arts. 3.002(o) y 9.011. Estos artículos establecen que **el elector mantendrá total control de su papeleta e interactuará directamente con el dispositivo electrónico de escrutinio.**

A su vez, el *Informe sobre el Sustitutivo de la Cámara al P. de la C. 1863*, emitido el 10 de noviembre de 2010 por la Comisión Especial de Reforma Gubernamental del Senado de Puerto Rico, expresa que con el proceso de escrutinio electrónico habrá que asegurarse "de que **el elector sea quien tenga el control de su papeleta**". Comisión Especial de Reforma Gubernamental del Senado, *Informe sobre el Sustitutivo de la Cámara al P. de la C. 1863*, págs. 19, 23. Vemos, pues, una intención legislativa de proteger el voto del elector exigiendo que cada elector tenga control de su voto y acceso directo a las máquinas de escrutinio.

Posterior a la aprobación del Código Electoral, el 3 de junio de 2011 se aprobó la Resolución Conjunta Núm. 44 en donde se ordenó a la C.E.E. a implantar el sistema de escrutinio electrónico durante los comicios del año 2012. La Resolución Conjunta Núm. 44 dispuso:

> a. Se utilizará un sistema de escrutinio electrónico, conocido como *Optical Scanning System (OpScan).* Este mecanismo consistirá de un lector óptico y una urna en la cual serán

depositadas las papeletas y el voto se llevará a cabo **mediante la interacción directa del elector con la máquina de escrutinio electrónico.**

b. El sistema deberá conservar evidencia física del voto que emitió el elector y que permita su posterior cotejo en un escrutinio o recuento.

c. La Comisión Estatal de Elecciones utilizará las últimas Guías Voluntarias, según adoptadas por la *Election Assistance Commission (EAC)*, para asegurar que al finalizar el proceso electoral electrónico, la Comisión Estatal de Elecciones haya cumplido con las guías mínimas establecidas por el Gobierno de los Estados Unidos de América a través de la Ley HAVA *(Help America Vote Act)* de 2002, según enmendada.

d. El sistema de escrutinio electrónico deberá estar previamente certificado en cumplimiento con los estándares más recientes, según adoptados por la *Federal Election Commission* o por la *Election Assistance Commission (EAC),* cuales estándares sean más recientes al momento en que la Comisión Estatal de Elecciones adjudique la licitación para adquisición de las máquinas de escrutinio electrónico. El sistema debe estar certificado para garantizar las ventajas significativas en el proceso de escrutinio, en términos del ahorro en tiempo y la precisión del proceso de adjudicación.

e. El sistema **deberá facilitar la participación para los electores con impedimentos en cumplimiento con la Ley HAVA**, incluyendo, pero sin limitarse, al desarrollo de sistemas de registro electrónico, *Poll Book*, o cualquier otro apoyo electrónico existente.

....

[L]a Comisión Estatal de Elecciones establecerá en la reglamentación pertinente los estatutos y parámetros para llevar a cabo **programas de educación masiva y campaña de orientación** dirigida a los electores sobre el sistema de escrutinio electrónico en fecha que **no será menos de seis (6) meses antes del evento electoral.**

Resolución Conjunta Núm. 44, Secs. 1-2.

Tras intentos fallidos de la C.E.E. por establecer los parámetros del proceso de escrutinio electrónico, el

4 de noviembre de 2011 ésta aprobó la Resolución Núm.
174. De una lectura de dicha resolución y del recurso de
Certificación que la C.E.E. presentó ante esta Curia, se
desprende que la Resolución Núm. 174 se emitió con el
propósito de cumplir con el requisito **procesal** de emitir
*algo* antes de la fecha del 6 de noviembre de 2011, pero
sin atender la sustancia del mismo.[10] Citamos la referida
resolución:

> [T]oda vez que la Junta de Subastas de la
> [C.E.E.] decretó desierta la Subasta Formal ...
> para la adquisición del sistema de escrutinio
> electrónico, la Comisión se encuentra en el
> proceso de seleccionar la compañía con la que
> contratará la producción del referido sistema.
> Sin embargo, de conformidad con el Artículo
> 3.015 del *Código Electoral de Puerto Rico para
> el Siglo XXI* ... la [C.E.E.] le notifica a la
> ciudadanía que utilizará un sistema de
> escrutinio electrónico, conocido como *Optical
> Scanning System* (OpScan), durante la elección
> general del 6 de noviembre de 2012, según
> ordenado por la ... Resolución Conjunta Núm.
> 44.
>
> Los electores continuarán votando mediante
> una marca en papeleta de papel. Sin embargo,
> ... se contarán los votos utilizando un sistema
> de escrutinio electrónico que consistirá de un
> lector óptico, una urna en la cual serán
> depositadas las papeletas y el voto se llevará
> a cabo mediante una interacción directa del
> elector con la máquina de escrutinio
> electrónico. El sistema de escrutinio
> electrónico garantizará que el elector ejercerá
> su derecho al voto de forma privada e
> independiente, y que cada sufragio se cuente en
> la forma en que fue votado. El sistema de

---

[10] Admite la peticionaria: "la C.E.E. **está obligada** por el
Artículo 3.015 del Código Electoral y por la R.C. 44 a
implantar un sistema de escrutinio electrónico en las
Elecciones Generales del 6 de noviembre de 2012
**independientemente de la forma en que el mismo le sea
notificado a la ciudadanía**". Recurso de Certificación de
la C.E.E., pág. 23 (énfasis en el original).

escrutinio electrónico le notificará al elector si ha emitido un voto válido, y le dará la oportunidad de corregir cualquier error en la papeleta que de otra forma invalide su voto. Luego de ser contadas por el lector óptico, las papeletas serán depositadas en una urna que estará adherida a la máquina de escrutinio que asegurará y protegerá las papeletas votadas como evidencia verificable de los votos emitidos en casos de escrutinio o recuento manual.

La [C.E.E.] promulgará la reglamentación necesaria para llevar a cabo un programa de educación masiva y campaña de orientación dirigida a los electores sobre el sistema de escrutinio electrónico por lo menos seis (6) meses antes de las elecciones generales del 6 de noviembre de 2012.

....

*Resolución de Aviso de Sistema de Votación, Sistema de Escrutinio Electrónico Conocido como Optical Scanning System (OpScan)*, CEE-RS-11-174, 4 de noviembre de 2011.

Aunque prolijo, estimamos necesario presentar un extracto de los tres documentos mencionados (art. 3.015 del Código Electoral, Resolución Conjunta Núm. 44 y Resolución Núm. 174) para una mejor comprensión de lo que discutiremos a continuación.

### III

### A

Reconocemos que el art. 3.015 del Código Electoral contiene un mandato hacia la C.E.E. que goza de dos características: (1) expreso y (2) vago o impreciso. Como indicamos anteriormente, ese mandato es: notificar **"todo lo relacionado"** al escrutinio electrónico.

Trazar una teoría sobre la naturaleza y constitución del vocablo *todo* resultaría tan fútil como descifrar el

significado transcendental de esa misma palabra.  No es
nuestra función entrar en consideraciones epistemológicas
sobre el **todo** o la **nada** en el lenguaje.  No nos
corresponde a los tribunales elucubrar sobre la
metafísica del lenguaje, sino realizar interpretaciones
plausibles, integradas a los propósitos legislativos y
razonables en pos del bienestar social. "When those
trained in the respective disciplines of medicine,
philosophy, and theology are unable to arrive at any
consensus, the judiciary, at this point in the
development of man's knowledge, is not in a position to
speculate as to the answer". *Roe v. Wade*, 410 U.S. 113,
159 (1973).

Al enfrentarnos al art. 3.015 del Código Electoral y
realizar un examen de hermenéutica sobre el significado
de la palabra **todo** en ese contexto, no podemos dejar a un
lado la sensatez.  Ergo, no es nuestra pretensión que se
incluya en la Resolución Núm. 174 hasta lo inimaginable o
hacer de ella una especie de holograma o *aleph* jurídico.
Todo lo contrario, el **todo** del art. 3.015 del Código
Electoral es una entidad amorfa que debemos ahora
rellenar de significado cónsono con la intención
legislativa y con aquello que sea razonable para lograr
los propósitos para los que se aprobó dicho artículo.[11]

---

[11] Del Diario de Sesiones del Senado, del 10 de noviembre
de 2010, se desprende la discusión habida en torno a la
aprobación del Sustitutivo de la Cámara de Representantes

*Véase Román Matos Matos v. Junta Examinadora de Ingenieros y Agrimensores*, 165 D.P.R. 741, 748-749 (2005) ("Resulta necesario que en nuestra interpretación armonicemos, hasta donde sea posible, todas las disposiciones de la ley con el propósito de lograr una interpretación integrada, lógica y razonable de la intención legislativa").

Para ello el propio Código Civil nos brinda unas herramientas de interpretación estatutaria. Dispone que "[l]as palabras de una ley deben ser generalmente entendidas en su más corriente y usual significación, sin atender demasiado al rigor de las reglas gramaticales,

─────────────────────────

al P. de la C. 1863, posteriormente convertido en el Código Electoral actual. Allí la Sra. Nolasco Santiago, quien fungía como Vicepresidenta del Senado y Presidenta de la Comisión Conjunta Especial que realizó los trabajos legislativos concernientes al nuevo Código Electoral, expresó:

Las características principales [del nuevo Código Electoral], la principal es que **está centrado en el elector**. Nosotros no tenemos que buscar el bienestar de otras cosas, lo que tenemos es que buscar el bienestar del elector.

. . . .

El nuevo Código Electoral ordena a la Comisión implantar un sistema de votación y escrutinio electrónico donde **el elector va a interactuar con la máquina de votación**. No es que yo voy a coger mis papeletas, voy a votar y las voy a echar en una urna para que luego otras personas las saquen de una urna y las van a contar, eso se acabó. ... [U]na vez yo cojo mis papeletas, nadie más las toca hasta que son contadas, y eso definitivamente nos tiene que dar una seguridad.

sino al uso general y popular de las voces". Cód. Civ. P.R. Art. 15, 31 L.P.R.A. Sec. 15. Por otra parte, el Código Civil también comenta: "Cuando las palabras de una ley son dudosas, su sentido debe ser buscado por el examen y comparación de las frases dudosas con otras palabras y sentencias que les estén relacionadas, en el orden de una buena investigación, para llegar a su verdadero significado". Cód. Civ. P.R. Art. 17, 31 L.P.R.A. Sec. 17. De haber dos o más leyes sobre el mismo asunto, entonces se aplica la interpretación codificada en el art. 18 del Código Civil: la interpretación debe realizase refiriendo unas leyes con otras, por cuanto lo que es claro en una ley puede usarse para explicar lo dudoso en la otra ley. Cód. Civ. P.R. Art. 18, 31 L.P.R.A. Sec. 18.

Así, pues, debemos analizar el art. 3.015 del Código Electoral en conjunto con la Resolución Conjunta Núm. 44, puesto que ésta tiene fuerza de ley. *Véase* 2 L.P.R.A. Sec. 200; *C.R.I.M. v. Méndez Torres*, 174 D.P.R. 216, 229 (2008); *Noriega v. Hernández Colón*, 135 D.P.R. 406, 450 (1994) (donde se expresa que las resoluciones conjuntas tienen fuerza de ley). Al analizar ambas disposiciones legislativas, notamos que se complementan y que no son excluyentes.

_____

Diario de Sesiones del Senado, 10 de noviembre de 2010, págs. 24058-24060.

La Resolución Conjunta Núm. 44 no define el contenido de la resolución que debía emitir la C.E.E. al menos doce meses previo a las elecciones ni detalla qué incluirá la frase "todo lo relacionado". Entre otras cosas, lo que hace es atender una omisión del art. 3.015 del Código Electoral sobre el proceso de **educación masiva y campaña de orientación**, y le provee un término distinto al del art. 3.015 para cumplir con esos objetivos. En otras palabras, el término de seis meses de la Resolución Conjunta Núm. 44 es para **redactar y emitir un reglamento de índole administrativo sobre la campaña de educación y orientación** sobre el proceso de escrutinio electrónico. Ese término de seis meses no es de aplicación al término para que la C.E.E. **notifique** a la ciudadanía los detalles en sí del sistema de escrutinio electrónico. El término de doce meses del art. 3.015 es para notificar, **mediante un mecanismo que no sea de la naturaleza de un reglamento**, todo lo relacionado al escrutinio electrónico. En la notificación de los doce meses previo a las elecciones no se tiene que indicar cómo será la educación masiva y campaña de orientación, sino sólo explicar cómo será el proceso.

A pesar de los postulados sobre interpretación estatutaria que provee el Código Civil, la Sentencia adoptada por la mayoría de este Tribunal colige erradamente que la finalidad legislativa mediante la

aprobación de la Resolución Conjunta Núm. 44 fue sustituir el término de notificación de doce meses previo a una elección por un término menor de seis meses. Así, la Sentencia le da **carácter enmendador** a una resolución conjunta sobre una ley, sin explicación jurídica alguna que sustente dicha conclusión. Bien sabemos que:

> Toda resolución conjunta sigue el mismo trámite de un proyecto de ley para su aprobación. Ambos instrumentos tienen la misma fuerza de ley y obligan por igual a la ciudadanía y al Estado a su cumplimiento. La diferencia entre un proyecto de ley y una resolución conjunta estriba en que el primero envuelve medidas de **carácter permanente y su vigencia es ilimitada** una vez convertido en ley. Mientras que la resolución conjunta es de **carácter transitorio**, por lo que su vigencia cesa tan pronto se cumple el propósito que la originó".

Néstor Rigual, *El poder legislativo de Puerto Rico*, págs. 95-96 (1961).

En el trigésimo primer día de sesión de la Convención Constituyente se desarrolló una discusión en torno a la aprobación de la disposición constitucional sobre las resoluciones conjuntas.[12] Allí, el delegado Sr. Reyes Delgado propuso que se enmendara el texto propuesto para que leyera "La Asamblea Legislativa determinará, por ley, los **asuntos especiales** ...". *Diario de Sesiones de la Convención Constituyente*, Tomo II, pág. 857 (1961) (énfasis suplido). Argumentó el Sr. Reyes Delgado:

---

[12] "Se determinará por ley los asuntos que puedan ser objeto de consideración mediante resolución conjunta, pero toda resolución conjunta seguirá el mismo trámite de un proyecto de ley". Const. P.R. Art. III, Sec. 18.

El propósito de esta enmienda es el siguiente: La Asamblea Legislativa puede decretar, por ley, que se puedan enmendar los códigos mediante resolución conjunta; que puedan hacerse, decretarse leyes de carácter general, mediante resolución conjunta [pero] la resolución conjunta no es otra cosa que una manera de legislar sobre asuntos de carácter especial.

... **[P]ero que nunca se pueda entender que la Asamblea Legislativa pueda enmendar los códigos y leyes de carácter general, a virtud de resoluciones conjuntas.**

*Id.* (énfasis suplido).

A esa intervención replicó el delegado Sr. Negrón López, Presidente de la Comisión de la Rama Legislativa, por entender que la enmienda propuesta era innecesaria porque la naturaleza misma de las resoluciones conjuntas es que serán utilizadas para asuntos especiales.[13] A pesar de ello, se mostró conforme con las expresiones antes transcritas del Sr. Reyes Delgado. Expresó el Sr. Negrón López:

[P]ara lograr el mismo propósito fue que nosotros establecimos en nuestra recomendación, la Comisión de la Rama Legislativa, que no haya ninguna otra especialidad que la que la Asamblea Legislativa determine por ley para legislar por resolución conjunta, **persiguiendo los mismos propósitos que tiene en mente el señor Reyes Delgado,** pero sin dejar el germen del tecnicismo en el estatuto constitucional.

---

[13] Obsérvese que la enmienda propuesta por el Sr. Reyes Delgado fue derrotada por razón de que las resoluciones conjuntas son de naturaleza especial y era innecesaria la inclusión propuesta. No obstante, todos los delegados que intervinieron estuvieron de acuerdo con el Sr. Reyes Delgado en que las resoluciones conjuntas, por su naturaleza limitada y específica, no pueden tener el efecto de enmendar una ley de carácter ilimitado y permanente. *Diario de Sesiones de la Convención Constituyente*, Tomo II, págs. 857-863 (1961).

> Por esas razones es que entiendo que no debemos aprobar la enmienda que propone el Sr. Reyes Delgado, **aunque estoy de acuerdo con el propósito que la informa.**

*Id.* en la pág. 858 (énfasis suplido).

Lo anterior es diáfano en cuanto al rechazo de que las resoluciones conjuntas tienen el poder de enmendar leyes. Si las resoluciones conjuntas tienen una duración limitada y un propósito específico, no podemos concluir que éstas tienen el poder de enmendar una ley permanente y de duración ilimitada. La Resolución Conjunta Núm. 44 no expresó en ningún momento que se estaba enmendando o derogando parte del Código Electoral ni tampoco se puede inferir que lo haya hecho tácitamente. Cód. Civ. P.R., Art. 6, 31 L.P.R.A. Sec. 6 (la derogación de una ley puede ser tácita cuando contiene nuevos preceptos contrarios o irreconciliables con la ley anterior). Yerra este Tribunal con dicha interpretación, pues ambas expresiones legislativas se complementan porque versan sobre la misma materia (escrutinio electrónico), pero atienden asuntos diferentes y con términos independientes. Recapitulamos, el término de doce meses es para dar una notificación preliminar del sistema de escrutinio,[14] mientras que el término de seis meses

---

[14] Preliminar no es sinónimo de ofrecer información incompleta o a medias. Lo preliminar no se circunscribe a la sustancia o contenido de lo notificado, sino a una demarcación temporal, cronológica o hasta espacial (en su etimología latina); presupone una etapa previa a una notificación posterior. Por cierto, la acepción de *preliminar* en el diccionario dispone: "Que antecede o se

atiende sólo la campaña de orientación o de educación masiva sobre cómo será el proceso.

**B**

Después de analizar el art. 3.015 del Código Electoral frente a la Resolución Conjunta Núm. 44, pasemos ahora a analizar ambos frente a la Resolución Núm. 174 de la C.E.E.   De las disposiciones legislativas se desprenden dos requisitos para la Resolución Núm. 174. Uno es sustantivo y el otro es procesal.   El primero va intrínsecamente atado al acápite anterior en donde expresamos que no hay que incluir dentro de la palabra "*todo*" hasta lo inimaginable, sino lo objetivamente necesario para cumplir con la intención legislativa y brindar una "garantía[] de pureza procesal [capaz] de contar cada voto en la forma y manera en que sea emitido".  Código Electoral, Art. 2.002.  El segundo requisito, el procesal, atiende el asunto temporal y fue precisamente el que quiso atender la C.E.E.[15]  Ambos están estrechamente ligados, pero el incumplimiento con el requisito sustantivo supone *ipso facto* el incumplimiento jurídico con el procesal. Por ello nos enfocaremos en evaluar el requisito sustantivo.

---

antepone a una acción, a una empresa, a un litigio o a un escrito o a otra cosa".  Real Academia Española, *Diccionario de la Lengua Española*, pág. 1822 (22da ed. 2001).

[15] *Véase* nota al calce número tres, *supra*.

Queremos comenzar por hacer una radiografía de la Resolución Núm. 174 para demostrar que ésta no aportó nada al conocimiento público de lo que la Asamblea Legislativa ya había dispuesto en el art. 3.015 del Código Electoral y en la Resolución Conjunta Núm. 44. En la tabla a continuación expondremos en la primera columna lo que dispone la Resolución Núm. 174 y en las otras dos columnas marcaremos con una equis cuando esa disposición provenga del Código Electoral o la Resolución Conjunta Núm. 44:

| Requisitos sustantivos en la Resolución Núm. 174 | Código Electoral (arts. 3.002(o), 3.015, 9.011); Diario de Sesiones del Senado y la Cámara de Representantes | Resolución Conjunta Núm. 44 |
|---|---|---|
| El elector tendrá posesión y control de las papeletas en donde hará una marca | X | |
| Se contarán los votos mediante sistema de escrutinio electrónico que consistirá en un lector óptico | X | X |
| Habrá interacción directa del elector con la máquina de escrutinio | X | X |
| El sistema de escrutinio garantizará el voto privado e independiente | | X |
| Cada sufragio se contará en la manera en que fue votado | | X |
| El sistema notificará si el voto fue válido y dará oportunidad de corregir cualquier error | X | |

| | | |
|---|---|---|
| Las papeletas serán depositadas en una urna adherida a la máquina | X | X |
| Las papeletas depositadas en la urna servirán como evidencia verificable en caso de escrutinio o recuento manual | | X |
| Se promulgará reglamentación sobre programa de educación masiva y campaña de orientación, por lo menos seis meses antes de las elecciones generales | | X |

Como se puede apreciar, la Resolución Núm. 174 lo que hace es recopilar lo ya dispuesto previamente por la Asamblea Legislativa, por lo que realmente no determina ni notifica **todo lo relacionado** a la forma del proceso de votación electrónica o escrutinio electrónico. Si lo dispuesto por la Asamblea Legislativa constituyere *todo lo relacionado* al sistema de escrutinio electrónico, ¿qué sentido tendría exigirle a la C.E.E. que notifique a la ciudadanía lo concerniente a ese proceso? Además, partiendo de la teoría de delegación de poderes a las agencias gubernamentales, la Asamblea Legislativa no tiene pericia sobre el asunto, por lo que es razonable pensar que lo dispuesto en el Código Electoral y la Resolución Conjunta Núm. 44 no puede constituir **todo lo relacionado** al proceso. ¿Si no lo constituye dentro de los propios textos de la ley, lo podría constituir en una resolución de la agencia? Esto, diáfanamente, raya en lo ilógico.

Si la intención de la Asamblea Legislativa hubiese sido que la C.E.E. copiara *ad verbatim* lo ya dispuesto legislativamente, no le hubiese requerido a la C.e.E. el término de doce meses antes de las elecciones generales, puesto que la información ya estaba notificada. Lo adoptado por la C.E.E. en la Resolución Núm. 174 no constituye una notificación con los requerimientos del art. 3.015 en la medida en que lo que se adoptó en esa resolución ya estaba notificado en la propia ley.

Con lo discutido previamente examinamos qué no significa **todo lo relacionado**. Ahora, pasemos a auscultar qué sí puede o debe incluir la frase en cuestión. Así veremos que el incumplimiento sustantivo de la C.E.E. fue doble: por un lado incluyó bajo el *todo* lo no debido y, por el otro, obvió lo necesario. Para cumplir con este objetivo debemos explicar qué tipos de sistemas de votación hay, en qué consiste el sistema de escrutinio electrónico y qué información es necesaria para que la ciudadanía se sienta debidamente notificada y pueda confiar en el andamiaje electoral y la maquinaria a utilizarse. *Véase Granados v. Rodríguez*, 124 D.P.R. 1 (1989).

Estudiosos de temas electorales identifican cinco formas o tecnologías de emitir el sufragio. Señala Eric

A. Fischer[16] que éstas son: "paper ballots, lever machines, punchcards, marksense forms, and electronic systems". Eric A. Fischer, *Voting Technologies in the United States: Overview and Issues for Congress*, pág. 1 (2001),

http://usa.usembassy.de/etexts/crights/reports/votetech.pdf *Véase además*, Daniel P. Tokaji, *The Paperless Chase: Electronic Voting and Democratic Values*, 73 Fordham L. Rev. 1711, 1717-1718 (2005). El seleccionado por la Asamblea Legislativa en el Código Electoral y la Resolución Conjunta Núm. 44 es el *marksense* u *optical scan*, en donde los electores:

> [M]ake their choices by using a pencil or pen to mark the ballot, typically by filling in an oval or drawing a straight line to connect two parts of an arrow. The ballots are counted by scanners, which may be located either at the precinct (in "precinct-count" systems) or at some central location ("central-count" systems).

Tokaji, *supra*, en la pág. 1722.

---

[16] Para el año en que se publicó el informe *Voting Technologies in the United States* (2001), Eric A. Fischer era un *Senior Specialist in Science and Technology* de la "Resources, Science, and Industry Division" del *Congressional Research Service*. En palabras de la página cibernética de la Librería del Congreso:

> The Congressional Research Service (CRS) works exclusively for the United States Congress, providing policy and legal analysis to committees and Members of both the House and Senate, regardless of party affiliation. As a legislative branch agency within the Library of Congress, CRS has been a valued and respected resource on Capitol Hill for nearly a century.

Library of Congress, http://www.loc.gov/crsinfo/ (*última visita* 25 de abril de 2012).

Este sistema de lente óptico puede representar tres tipos de errores: *overvote* (se vota por más de los candidatos permitidos), *undervote* (se vota por menos de los candidatos permitidos) o *unintended vote* (se vota inadvertidamente por el candidato no deseado). Fischer, *supra*, en la pág. 8.[17] No obstante, esos errores son corregibles mediante un proceso que forma parte del mismo sistema. El problema que salta a la vista es que habiendo dos tipos de sistemas OpScan, el "central-count optical scan" y el "precint-count optical scan", la corrección del error en la papeleta va a ser diferente. Comenta Fischer: "With marksense systems where tabulation is done **at the precinct, ballots may be checked** by the tabulator for some kinds of error before being submitted. However, marksense systems where tabulation is done at a **central location do not permit such machine-assisted error correction**". *Id.* en la pág. 9 (énfasis suplido).

Otro asunto con los errores durante la votación es que "[t]he incidence of errors may also depend on the condition of voting equipment and **the demographics of the voting population**". *Id.* en la pág. 9 (énfasis suplido); Tokaji, *supra*, en las págs. 1744-1747. Teniendo en cuenta la pluralidad de ciudadanos que participan en los comicios electorales, desde personas duchas en asuntos

---

[17] "Paper or **marksense ballots can easily be mismarked**, for example by a voter circling the name of a candidate

tecnológicos hasta personas a quienes les cuesta más tiempo y esfuerzo adaptarse a éstos, este dato nos resulta de mucha importancia.

Notamos, pues, que el sistema tiene unos detalles importantes que deben conocerse y notificársele a la ciudadanía. Sin embargo, la Resolución Núm. 174 obvia éstos, como por ejemplo:

1- La compañía contratada para realizar el escrutinio electrónico;

2- El tipo de máquinas a utilizarse: "central-count optical scan" o "precint-count optical scan";

3- El *software* o sistema que usarán las máquinas;

4- Detalles sobre la probabilidad de manipulación de la información registrada en la máquina;

5- El porciento de margen de error del escrutinio;

6- El procedimiento de votación de las personas con necesidades especiales (con impedimentos);[18]

7- Las ayudas que se brindarán a personas de edad avanzada a quienes les resulte difícil el proceso[19]

_____

[17] rather than marking the appropriate box". Fischer, *supra*, en la pág. 8 (énfasis suplido).

[18] La ley Help America Vote Act require que "People with disabilities must also be accommodated, through voting machines that 'provide[] the same opportunity for access and participation (including privacy and independence) as for other voters'". Tokaji, *supra*, en la pág. 1733.

[19] "The Voting Accessibility for the Elderly and Handicapped Act of 1984 (42 U.S.C. 1973ee) requires that election jurisdictions make available accessible polling

8- La manera de escrutar electrónicamente los votos por nominación directa (*write-in*);

9- La forma en que se realizará el escrutinio en aquellos casos de votos ausentes y votos adelantados; no olvidemos que una de las garantías del derecho al voto recogidas en el Código Electoral es que cada voto "se cuente y se adjudique de la manera en que el elector lo emita". Código Electoral, Art. 6.001(10).[20]

10- La manera en que los electores que ejerzan su voto ausente podrán corregir errores en sus papeletas, si es que pueden. Si no pueden realizar la corrección, igualmente habría que notificarlo, aunque ello violaría la disposición de ley de que cada elector tendrá interacción directa con la máquina de escrutinio (Resolución Conjunta Núm. 44).

La ausencia de estos detalles en la Resolución Núm. 174, evidentemente causa incertidumbre e inseguridad, principalmente en aquellos electores con necesidades especiales o electores ausentes o de voto adelantado, quienes se ven directamente afectados en su derecho al

_____

places and aid to elderly and disabled voters". Fischer, *supra*.

[20] "Obviously included within the right to choose, secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted". *United States v. Classic*, 313 U.S. 299, 315 (1941).

sufragio. Cuando al voto de un ciudadano no se le da el mismo peso que al voto de otro ciudadano, se configura una violación al derecho de sufragio como si le hubieran negado el libre ejercicio de emitir su voto. *Véase Bush v. Gore*, 531 U.S. 98 (2000).

Con la ausencia de información imprescindible en la Resolución Núm. 174, como información relativa al voto de personas con necesidades especiales, votos adelantados y votos ausentes, se resta el valor o el peso del voto de aquellas personas incluidas en esas clasificaciones. Esto, ciertamente, constituye una violación al derecho al sufragio de esas personas y al derecho a la igual protección de las leyes.

La Sentencia emitida por este Tribunal indica que el Tribunal de Primera Instancia "impuso a la C.E.E. requisitos adicionales a los contemplados por el Código Electoral y la Resolución Núm. 44". Sentencia, pág. 23. En efecto, ante la vaguedad e imprecisión del Código Electoral y la Resolución Conjunta Núm. 44 en cuanto al contenido de la resolución a emitirse a más tardar un año antes de las elecciones, el foro de instancia correctamente interpretó la disposición legislativa de la manera más favorable para salvaguardar el derecho al sufragio de todo ciudadano. "[A]nte cualquier posible vaguedad o laguna en las disposiciones estatutarias o reglamentarias que regulan el ejercicio al voto, **la**

**interpretación adoptada debe dar primacía a la máxima protección de la expresión electoral**". *Suárez v. C.E.E. I*, 163 D.P.R. 347, 355 (2004). Ante dicha vaguedad, procede que protejamos el derecho al voto de todos los electores hábiles en Puerto Rico, garantizándoles un ambiente de certidumbre, tranquilidad, seguridad y confianza en el proceso electoral.

Por otra parte, la Sentencia hoy emitida comenta que los requisitos impuestos por el Tribunal de Primera Instancia van dirigidos a "aspectos técnicos" que en nada afectan el derecho al sufragio. Sentencia, pág. 23. ¿Acaso **obviar** lo concerniente a cómo las **personas con necesidades especiales** o las **personas que emitirían voto adelantado o ausente** constituye "aspectos técnicos que en nada afectan el derecho de la ciudadanía con relación a su sufragio"? ¿Querrá decir una mayoría de este Tribunal que las personas con necesidades especiales **carecen de consideración** o que **sus votos no tienen el valor que el de cualquier otro ciudadano**? ¿Igual con las personas que emitan voto adelantado o ausente? ¿O quizás quiere decir la mayoría que el valor de esas personas como ciudadanos aptos para votar se reduce a "aspectos técnicos" que no afectan al resto de la ciudadanía? Es lamentable, por no decir trágico, que desde esta Curia se expresen dichas aseveraciones. El Tribunal de Primera Instancia tuvo ante sí toda la evidencia que desfiló en este caso y ante

el balance de intereses entre buscar mayor agilidad para el proceso de votación *vis à vis* al alto interés público de proteger el derecho al sufragio y garantizar que el elector emita un voto informado, el tribunal *a quo* ejerció correctamente su discreción de proteger el derecho al voto.

## IV

### A

En nuestra jurisdicción es sabido que las agencias gubernamentales son creadas por ley y en lo subsiguiente se rigen por su ley orgánica. "El estatuto orgánico o ley habilitadora de una agencia es lo que 'define y delimita' la extensión de la jurisdicción de la agencia. ... 'Cualquier transgresión a lo pautado por la ley [habilitadora de la agencia] respecto a los linderos de acción constituye una acción ilícita. Se considera que dicha actuación ha sido efectuada sin autoridad". *Perfect Cleaning Services v. Corporación del Centro Cardiovascular de Puerto Rico y del Caribe*, 162 D.P.R. 745, 758-759 (2004) (citando a Demetrio Fernández Quiñones, *Derecho Administrativo y Ley de Procedimiento Administrativo Uniforme*, pág. 131 (2da ed. 2001)).

Teniendo en cuenta que la C.E.E. fue creada por virtud del art. 3.001 del Código Electoral, es razonable concluir que dicho Código constituye la ley orgánica que rige los linderos de acción permitida de la C.E.E. y

delimita la extensión de jurisdicción de ese organismo administrativo. *Perfect Cleaning v. Cardiovascular*, 162 D.P.R. 745 (2004). Así, pues, cualquier actuación de la C.E.E. que no obedezca el poder que le fue conferido mediante su ley habilitadora debe ser catalogada *ultra vires*. *D.A.C.O. v. Servidores Públicos Unidos de P.R.*, 2012 T.S.P.R. 58, en la pág. 9. Todos los actos u órdenes ejecutados por la agencia que se extralimitan de lo dispuesto en la ley habilitadora son erróneos y nulos. *Id.* Por tal motivo, toda actuación de la C.E.E. referente al proceso de implantación del escrutinio electrónico que fuera posterior al incumplimiento de la Resolución Núm. 174 con los requisitos del art. 3.015 del Código Electoral, es *ultra vires*.

El incumplimiento sustantivo y procesal de la Resolución Núm. 174 con el mandato expreso del Código Electoral, claramente constituye un error insubsanable. Esto, pues es inconcebible cumplir con el término de *no menos de doce meses con antelación a una elección*, cuando apenas estamos a cerca de seis meses previo a los comicios del 6 de noviembre de 2012.[21] Ese error, no obstante, no deja sin efecto la política pública

---

[21] Nos unimos a las expresiones realizadas por el foro de instancia: "Es perturbador que a pocos meses de las elecciones del 2012, que van a tener, no s[ó]lo las elecciones generales, sino además un plebiscito que afectará el futuro del país, **se descanse en un sistema que desconocemos c[ó]mo operará**". Sentencia del Tribunal de Primera Instancia, pág. 53 (énfasis suplido).

implantada en el Código Electoral, a los efectos de que se introducirán nuevas tecnologías electrónicas a los procesos electorales en Puerto Rico.[22] Por ello el error insubsanable para las elecciones del año 2012 no releva a la C.E.E. de su deber de realizar las gestiones correspondientes para implantar el escrutinio electrónico en futuros eventos electorales.

Debido a la naturaleza limitada y específica de la Resolución Conjunta Núm. 44, este error insubsanable de la C.E.E. sí deja sin efecto ese mandato legislativo. Ello, empero, no afecta la política pública del Código Electoral, puesto que lo estatuido en la Resolución Conjunta Núm. 44 tendrá vigencia sólo hasta el 6 de noviembre de 2012. 2 L.P.R.A. Sec. 200; Op. Sec. Just. Núm. 11 de 1973. Cabe mencionar que la propia C.E.E., y acogido con aprobación por la Sentencia que hoy se emite, págs. 20-21, adelanta en su recurso de Certificación la posibilidad de incumplir con el mandato legislativo de la Resolución Conjunta Núm. 44. Señala la C.E.E. que el hecho de proseguir con el proceso de negociación con la compañía seleccionada, "no quiere decir de modo alguno que la C.E.E. proseguirá con su implantación si alberga

---

[22] No perdamos de perspectiva que el Código Electoral es una ley de carácter ilimitado y permanente, por lo que un error insubsanable de la C.E.E. no revierte esa característica, sino que obliga a la agencia a cumplir el mandato legislativo nuevamente y con la precaución que exige la propia ley.

alguna duda en cuanto a su funcionamiento".[23] Vemos que decretar el error de la C.E.E. como un error insubsanable, plantea el mismo escenario al que la C.E.E. y una mayoría de este Foro están dispuestos a acudir: el incumplimiento con el mandato legislativo recogido en la Resolución Conjunta Núm. 44.

**B**

La Sentencia emitida por esta Curia dice que el daño del recurrido es especulativo y a destiempo. La mayoría del Tribunal se contradice al concluir, por un lado, que los daños del recurrido son especulativos y a destiempo, mientras que, por el otro lado, procede a **brindarle deferencia** a las determinaciones de hecho del foro de instancia.[24] Esto, evidentemente, resulta una contradicción si se tiene en cuenta que en la determinación de hecho número 56 el Tribunal de Primera Instancia, tras varias vistas evidenciarias, dio por probado que el demandante sufre un daño como elector porque la falta de información sobre el proceso de

---

[23] Recurso de Certificación de la C.E.E., pág. 17.

[24] "En cuanto a los planteamientos relacionados con las determinaciones del Tribunal de Primera Instancia, éstas gozan de deferencia, por lo que en ausencia de un reclamo específico por la C.E.E. no intervendremos con la apreciación de la prueba realizada por el foro primario". Sentencia, págs. 21-22. Dicha Sentencia añade que la "deferencia no se extiende a las conclusiones de derecho subsumidas e identificadas erróneamente como determinaciones de hecho". *Id.* Sin embargo, no se identifican palmariamente cuáles fueron los errores de identificación, sino que se limita a la generalización citada.

escrutinio electrónico produce **desconfianza, inseguridad, incertidumbre** sobre el proceso en sí, además que promueve **falta de entusiasmo** en los electores en participar en las elecciones.[25] Sentencia T.P.I., pág. 26.

Debemos destacar que el art. 6.001 del Código Electoral reconoce el derecho del elector a emitir libremente su voto y a que éste se adjudique de la manera en que el elector lo emita. Dicho artículo, a su vez, le reconoce a todo elector la capacidad para "iniciar o promover cualesquiera acciones legales al amparo de esta Declaración de Derechos y Prerrogativas de los Electores ante el Tribunal de Primera Instancia". Código Electoral, art. 6.001. Visto que el reclamo del recurrente es en torno a una violación actual a ese derecho estatutario y constitucional, yerra el Tribunal al tildar de especulativo y a destiempo el daño reclamado.

## V

Finalmente, huelga decir que nuestra función desde la judicatura es proteger los derechos de la ciudadanía, particularmente el derecho al voto aquí en controversia, contra actuaciones interventoras e irrazonables del Estado. *Ortiz Angleró v. Barreto Pérez*, 110 D.P.R. 84 (1980). No nos corresponde realizar un juicio moral

---

[25] Obsérvese que estos daños son los mismos que alegó el Partido Nuevo Progresista recientemente cuando acudió el 2 de abril de 2012 ante este Foro mediante recurso de Certificación y una mayoría de esta Curia decidió abrir

sobre los beneficios o perjuicios del proceso de escrutinio electrónico. Es nuestra responsabilidad como jueces de esta Curia velar por los derechos de toda la ciudadanía, irrespectivamente de nuestros posicionamientos personales en torno a la medida que intenta implementar el Estado. *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833 (1992) ("Our obligation is to define the liberty of all, not to mandate our own moral code").

Si bien puede ser muy encomiable aunar esfuerzos para aspirar a un sistema que agilice y modernice nuestros procesos electorales, ello debe ser en armonía con salvaguardar un derecho tan preciado como el sufragio, mas no a costa de éste. Es por estas razones que ante el proceder que hoy asume una mayoría de este Tribunal, respetuosamente disiento.


                              Anabelle Rodríguez Rodríguez
                                     Juez Asociada

---

las puertas del Tribunal al reconocerle al peticionario esos daños. *P.N.P. v. Conty Pérez*, 2012 T.S.P.R. 61.